(No. 70496.—

PENNY PULLEN, Appellant and Cross-Appellee, v. ROSEMARY MULLIGAN, Appellee and Cross-Appellant.

*Opinion filed September 21, 1990.*

22

26

28

Michael E. Lavelle and Robert M. Motta, of Lavelle, Holden & Juneau, of Oak Park, and Robert A. Mankivsky, of West Chicago, for appellant and cross-appellee.

Burton S. Odelson and Mathias W. Delort, of Odelson & Sterk, Ltd., of Evergreen Park; Robert J. Downing, of Miller, Forest & Downing, of Glenview; and William T. Barker and Alan J. Mandel, of Sonnenschein, Nath & Rosenthal, of Chicago, for appellee and cross-appellant.

JUSTICE WARD delivered the opinion of the court:

This appeal arises out of an election contest which the appellant, Penny Pullen, filed pursuant to section 7—63 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par.

7—63). A primary election was held on March 20, 1990, to determine the Republican nominee for the office of Representative in the General Assembly for the 55th Representative District. Rosemary Mulligan, the appellee here, was declared elected as the nominee and so certified by the State Board of Elections on April 9, 1990, as having received a majority of the votes cast, 7,431, for such office. Penny Pullen, the appellant here, was certified by the State Board of Elections as having received the second highest number of votes cast, 7,400, for such office. Pullen and Mulligan each filed a petition for a discovery recount, pursuant to section 22—9.1 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 22—9.1).

On April 19, 1990, 10 days after the State Board certified Mulligan as the Republican candidate, Pullen filed a "Petition of Election Contest" in the circuit court of Cook County, naming Mulligan as the respondent. The petition alleged various irregularities as to the voting procedure and count and asked the court to declare Pullen the winner of the election. Mulligan filed responsive pleadings, including a motion to dismiss the petition and a counterclaim alleging certain irregularities in tabulation. The motion to dismiss alleged that the petition had not been filed within the statutory time limit for filing such petitions (Ill. Rev. Stat. 1989, ch. 46, par. 7—63) and challenged the jurisdiction of the trial court to hear the contest. The trial court denied the motion to dismiss, and commenced trial on the issue of whether Pullen could demonstrate a reasonable likelihood that a recount would change the results of the election. After reviewing the results of a discovery recount and hearing evidence and the arguments of the parties, the trial court ordered a recount of all the Republican ballots cast in the election.

After the recount, each of the parties filed a number of motions urging the court to consider certain catego-

ries of ballots and to disregard other categories of ballots, in determining the result of the recount. After hearing evidence and arguments on these motions, the trial court entered an order specifying which categories of ballots would be considered in the recount. After entering this order, the court determined that the recount resulted in a net gain of 1 vote for Pullen and a loss of 30 votes for Mulligan. The trial court then determined that each candidate had received 7,387 votes, producing a tie vote. The trial court then directed the State Board of Elections to conduct a lottery pursuant to section 7—59 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 7—59), to determine the nominee. A lottery by coin flip was held on July 18, 1990, and resulted in Mulligan's favor. Accordingly, the trial judge entered an order declaring Mulligan the winner of the primary election. Pullen appealed and Mulligan cross-appealed certain rulings in Pullen's favor. We allowed Pullen's petition for leave to appeal directly to this court (107 Ill. 2d R. 302(b)).

We first consider whether Pullen timely filed her petition to contest the primary election. Courts have no inherent power to hear election contests, but may do so only when authorized by statute and in the manner dictated by statute. (*In re Contest of Election for Governor* (1983), 93 Ill. 2d 463; *Young v. Mikva* (1977), 66 Ill. 2d 579.) Section 7—63 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 7—63) contains the enabling language and procedural requirements for an action challenging a candidate's nomination in a primary election. That section provides:

> "Any candidate whose name appears upon the primary ballot of any political party may contest the election of the candidate or candidates nominated for the office for which he or she was a candidate by his or her political party, *** by filing with the clerk of the circuit court a petition in writing, setting forth the grounds of contest,

which petition shall be verified by the affidavit of the petitioner or other person, and which petition *shall be filed within 10 days after the completion of the canvass of the returns by the canvassing board making the final canvass of returns.* The contestant shall also file with that canvassing board (and if for the nomination for an office, certified tabulated statements of the returns of which are to be filed with the State Board of Elections, also with the county canvassing board), a notice of the pendency of the contest." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 46, par. 7—63.)

Failure to timely file an election contest prohibits the court from proceeding with the contest. *Patterson v. Crowe* (1944), 385 Ill. 514; *Orbach v. Axelrod* (1981), 100 Ill. App. 3d 973.

Here we must consider whether the trial court correctly determined that Pullen's election contest petition was filed within 10 days after the completion of the canvass by the canvassing board making "the final canvass of returns." (Ill. Rev. Stat. 1989, ch. 46, par. 7—63.) The appellant, Penny Pullen, argues that the State Board of Elections made the final canvass of returns on April 9, 1990. She argues that her petition was timely filed on April 19, 1990, 10 days after the State Board made its canvass of the returns. The appellee, Rosemary Mulligan, argues that the canvassing board making the final canvass of returns in this case was the Cook County Canvassing Board (County Canvassing Board), which completed its canvass on March 23, 1990. She argues that the petition was not timely filed because it was not filed within 10 days after the County Canvassing Board canvassed the returns. Accordingly, the specific issue which we must address here is whether the Cook County Canvassing Board or the State Board of Elections was the canvassing board making "the final canvass of returns" for the office in question.

A general overview of the relevant provisions of the Election Code is helpful in addressing this issue. The Election Code codifies the laws governing primary and general elections in this State. Article 7 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 7—1 *et seq.*) regulates the primary election process. In primary elections candidates compete for nomination as their party's candidate for State, congressional, judicial, city, county, village, municipal district, township, and other governmental offices. Precinct, township, ward and State central committeemen are also elected in primary elections, as well as delegates to national nominating conventions. Article 7 specifies the time for holding primary elections, the qualifications and registration of persons who vote in primary elections, nomination of candidates who run in primary elections, procedural aspects of the primary election, and the procedures governing post-election contests.

Article 8 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 8—1 *et seq.*) is similar to article 7 in many respects, except that article 7 regulates the nomination and election of candidates for all elective offices considered in the primary, while article 8 specifically regulates the nomination and election of candidates for the General Assembly. The first 14 sections of article 8 specify the dates on which primary elections for legislative candidates shall be held, how petitions for nominations of legislative candidates may be filed, and generally describe the pre-election procedures for primary elections in which candidates for legislative offices are chosen. Article 8 does not, however, specifically delineate how primary elections involving legislative candidates shall be conducted, nor does it delineate the procedures for contesting the results of such primary elections. Section 15 of article 8 states that, except as article 8 expressly provides otherwise, article 7 "shall, so far as the same may

be applicable, apply to and govern primary elections and contests thereof held under the provisions of this Article 8." (Ill. Rev. Stat. 1989, ch. 46, par. 8—15.) Section 8—15 also states:

> "The returns of such primary [in which candidates for legislative offices are nominated] shall be made to the county clerk or board of election commissioners as the case may be ***.
>
> Tabulated statements of the returns of the primary for the nomination of candidates for legislative offices shall be made to the State Board of Elections, *canvassed by the Board*, proclamation of the result thereof made, and certificates of nomination issued, as in the case of other tabulated statements of returns made to the State Board of Elections, and the election of any person nominated may be contested by filing with the clerk of the circuit court a petition in writing and filing notice in writing with the proper canvassing boards as required by Article 7 hereof." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 46, par. 8—15.

Pullen points out that section 8—15 specifically requires the State Board to canvass the tabulated statement of returns which it receives from the County Canvassing Board before proclaiming the result of the primary election. She argues that section 8—15 is consistent with provisions in article 7 which delineate how the returns in primary elections in which candidates for legislative offices are nominated shall be canvassed.

Section 7—56 specifies the manner in which returns shall be canvassed in primary elections. The first sentence of section 7—56(5) provides:

> "The officers who are charged by law with the duty of canvassing returns of general elections made to the county clerk, shall also open and canvass the returns of a primary made to such county clerk." (Ill. Rev. Stat. 1989, ch. 46, par. 7—56(5).)

Section 22—1 of the Election Code identifies the officers who are charged with the duty of canvassing returns of general elections. That section states:

"Within 7 days after the close of the election at which candidates for offices hereinafter named in this Section are voted upon, the county clerks of the respective counties, with the assistance of the chairmen of the county central committees of the Republican and Democratic parties of the county, shall open the returns and make abstracts of the votes on a separate sheet for each of the following:

\* \* \*

H. For Senators and Representatives to the General Assembly." (Ill. Rev. Stat. 1989, ch. 46, par. 22—1.)

Reading section 7—56(5) and section 22—1 together, it is clear that the County Canvassing Board, which is responsible for canvassing the returns of general elections in which candidates for Representatives to the General Assembly are elected, is also responsible for canvassing such returns in primary elections. Section 7—56(5) outlines what the County Canvassing Board must do after it completes the canvass of returns. That section provides:

"Upon the completion of the canvass of the returns by the county canvassing board, said canvassing board shall make a tabulated statement of the returns for each political party separately, stating \*\*\* the total number of votes cast in said county for each candidate for nomination by said party \*\*\*. Within two (2) days after the completion of said canvass by said canvassing board the county clerk shall mail to the State Board of Elections a certified copy of such tabulated statement of returns. \*\*\* [S]aid officers shall also determine and set down as to each precinct the number of ballots voted by the primary electors of each party at the primary." Ill. Rev. Stat. 1989, ch. 46, par. 7—56(5).

The appellee, Mulligan, argues that, under section 7—56(5), the canvassing process is completed once the

County Canvassing Board canvasses the returns and sends a certified tabulated statement of returns to the State Board of Elections. She argues that, once the County Canvassing Board sends a certified tabulated statement of returns to the State Board, the State Board's only function is to proclaim the result. She argues that in the primary election at issue here, the County Canvassing Board was the only board which canvassed the returns and, thus, was the canvassing board which conducted "the final canvass of returns" within the meaning of section 7—63.

The appellant, Pullen, points out, however, that section 7—56(6) of the Election Code specifies that the State Board must canvass the certified tabulated statement of returns which it receives from the County Canvassing Board. Section 7—56(6) states:

> "In the case of the nomination of candidates for offices, *** certified tabulated statement of returns for which are filed with the State Board of Elections, *said returns shall be canvassed by the board.*" (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 46, par. 7—56(6).)

Pullen argues that section 7—56(6) is consistent with section 8—15, which also states that the State Board of Elections shall canvass the certified tabulated statements of returns which are filed with the State Board.

Mulligan concedes that section 8—15 and section 7—56(6) require the State Board to canvass tabulated statements of returns. She argues, however, that the State Board did not, in fact, act as a canvassing body in this instance. Because the 55th Representative District is solely within suburban Cook County, she argues that the votes cast in that race are canvassed solely by the Cook County Canvassing Board, and that the State Board's only duty was to proclaim Mulligan the winner after it received a tabulated statement of returns from the Cook County Canvassing Board. As authority for her argu-

ment, Mulligan cites the opinion of the presiding judge of the county division of the circuit court of Cook County in McDunn v. Williams (Cir. Ct. Cook County), Docket No. 90—CO—116.

In McDunn v. Williams, the petitioner, Susan McDunn, brought an action to contest the primary election of James Williams, who was declared the Democratic nominee for the office of judge of the circuit court, Cook County Judicial Circuit. The petitioner in the McDunn case, as in this case, filed her election contest petition 10 days after the State Board of Elections certified Williams as the Democratic nominee for the judicial office. The trial court dismissed the petition as untimely, holding that it was not filed within 10 days after the completion of the canvass by the canvassing board making "the final canvass of returns," as required by section 7—63 of the Election Code.

In its memorandum opinion dismissing the petition in McDunn v. Williams, the trial court explained that only voters residing in the City of Chicago voted in the particular race at issue. The court determined that, under section 7—56(7) of the Election Code, the board of election commissioners for the City of Chicago was responsible for canvassing the returns of the judicial office in question. That section provides:

"Where in cities or villages which have a board of election commissioners, the returns of a primary are made to such board of election commissioners, said return shall be canvassed by such board, and, excepting in the case of the nomination for any municipal office, tabulated statements of the returns of such primary shall be made to the county clerk." (Ill. Rev. Stat. 1989, ch. 46, par. 7—56(7).)

The trial court observed that, although the Election Code did not define the term "canvass," Black's Law Dictionary defined that term as "the act of examining

and counting the returns of votes cast at a public election to determine authenticity." (As we shall point out, application of such a limited definition of canvass is simplistic in interpreting the significance of the term "canvass" in the statutory scheme here.) The court then concluded that, because all votes cast in the primary for the office at issue were cast in Chicago, the Chicago board of election commissioners was the only canvassing board which actually examined and counted the votes for the office in question. The court held that the Chicago board of election commissioners was, therefore, the "final canvassing board" within the meaning of section 7—63 of the Election Code.

The court determined that the State Board of Elections did not examine and count the returns, but simply proclaimed and certified the result of the election. The court concluded that the State Board's function was entirely different from that performed by the "final canvassing board" which "has the responsibility of counting the votes." The trial court determined that the State Board of Elections acts as the final canvassing board only in elections for offices which encompass more than one county, since, in such elections, the State Board must count the votes on the statements of returns received from various county canvassing boards in order to determine the outcome of the election.

The opinion in the McDunn case cannot be viewed as authority here, however, because it failed to consider the State Board's statutory duty to canvass primary election returns. (Ill. Rev. Stat. 1989, ch. 46, par. 7—56(6).) Instead, it adopted a simplistic definition of the term "canvass" and determined that only those boards which examine and count the returns are canvassing boards within the meaning of section 7—63 of the Election Code. Applying that definition, the trial court in the McDunn case concluded that the Chicago board of election

commissioners was the only body that canvassed the returns for the office in question and, thus, was the board conducting the final canvass of returns.

The court in McDunn v. Williams found the appellate court's decision in *Orbach v. Axelrod* (1981), 100 Ill. App. 3d 973, controlling. Mulligan likewise cites *Orbach* as authority for her argument that the County Canvassing Board was the final canvassing board. *Orbach*, however, did not consider or decide which canvassing board conducted "the final canvass of returns" within the meaning of section 7—63. Rather, the issue in that case was whether the petitioner was required to file his election contest petition under the 10-day time limit specified in section 7—63, which pertains to election contests in primary elections, or under the 30-day time limit set out in section 23—20 of the Election Code, which pertains to election contests in general elections. The appellate court determined that the provisions of section 7—63 applied. Accordingly, the court dismissed as untimely the election contest petition which Orbach filed 28 days after the board of election commissioners declared Axelrod elected as the Democratic ward committeeman for Chicago's 46th Ward.

Moreover, in *Orbach*, the Chicago board of election commissioners was the only, and thus the final, canvassing board. *Orbach* was an election contest challenging the primary election of a candidate to the office of ward committeeman. The Chicago board of election commissioners was required under section 7—56(7) of the Election Code to canvass the returns of the primary election of ward committeemen and to send a tabulated statement of returns from such election to the county clerk. Unlike the primary election at issue here, however, the Election Code does not require the Cook County Canvassing Board to canvass the tabulated statement of returns for the office of ward committeeman which the

Chicago board of election commissioners sends to the county clerk. See Ill. Rev. Stat. 1989, ch. 46, pars. 7—56(5), 22—1.

The State Board of Elections likewise had no statutory duty to canvass the returns of the election at issue in *Orbach*. Section 7—56(6) specifies that "returns shall be canvassed" by the State Board of Elections only "[i]n the case of the nomination of candidates for offices, certified tabulated statement of returns for which are filed with the State Board of Elections." Section 7—56(5) specifically states that tabulated statements of returns of votes cast for the office of ward committeeman shall not be certified to the State Board of Elections. Thus, neither the County Canvassing Board nor the State Board of Elections was required by statute to canvass the returns at issue in *Orbach*. Because the board of election commissioners was the only canvassing board required by statute to canvass the election returns for ward committeemen, it was the board conducting "the final canvass of returns" within the meaning of section 7—63. Accordingly, the 10-day period for filing an election contest began after the board of election commissioners performed its canvass.

*Orbach* cannot be viewed as controlling authority in circumstances where the State Board of Elections is required by statute to canvass election returns. Here, sections 7—56(5) and 22—1 of the Election Code, construed together, require the Cook County Canvassing Board to canvass the primary election returns for the Republican candidate for the office of Representative to the General Assembly for the 55th Representative District. (Ill. Rev. Stat. 1989, ch. 46, par. 7—56(5).) Under section 7—56(5) of the Election Code, the county clerk has a duty to file a certified copy of the tabulated statement of returns prepared by the County Canvassing Board for that office with the State Board of Elections. (Ill. Rev. Stat. 1989,

ch. 46, par. 7—56(5).) Section 7—56(6) of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 7—56(6)) imposes a duty upon the State Board of Elections to canvass any certified tabulated statement of returns which it receives from the county clerk.

Mulligan nevertheless argues that the Cook County Canvassing Board was the only board which canvassed the returns in question. She argues that the 55th Representative District lies entirely within Cook County and that the Cook County Canvassing Board was the only board which examined and counted the returns. She argues that the County Canvassing Board therefore conducted the final canvass of returns within the meaning of section 7—63. She argues that the State Board did not perform any canvassing function because it received a tabulated statement of returns from only one county canvassing board, and neither counted nor tallied any votes. She claims that the State Board's only function was to certify the result of the election.

As support for this argument, Mulligan cites section 7—58 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 7—58), which requires each canvassing board, upon completion of its canvass of the returns, to make and transmit to the State Board of Elections a proclamation of the results of the primary. Mulligan argues that the County Canvassing Board must be the board conducting the final canvass of returns because it has authority to proclaim the results of the primary election. She argues that the State Board's only function is to certify the results of the election.

Analysis of section 7—60 of the Election Code demonstrates, however, that the proclamation of the State Board of Elections, rather than that of the County Canvassing Board, is determinative. Section 7—60 provides:

"Not less than 67 days before the date of the general election, the State Board of Elections shall certify to the

county clerks the names of each of the candidates who have been nominated *as shown by the proclamation of the State Board of Elections as a canvassing board* \*\*\* and direct the election authority to place upon the official ballot for the general election the names of such candidates \*\*\*." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 46, par. 7—60.)

The proclamation of the County Canvassing Board is determinative only for those offices for which tabulated statements of returns are not filed with the State Board of Elections (*e.g.*, precinct, township and ward committeemen). In such cases, the County Canvassing Board's proclamation is determinative because the State Board is not required by statute to canvass the election returns for such offices. See Ill. Rev. Stat. 1989, ch. 46, pars. 7—56(5), 7—58, 7—60.

Mulligan also argues that the decision in *Young v. Washington* (1984), 127 Ill. App. 3d 1094, supports her position that the State Board of Elections simply proclaims the result of the election. *Young* involved an election contest between candidates for the Democratic party nomination for the office of Representative in the General Assembly for the 24th Representative District. The 24th Representative District is wholly within the City of Chicago, in Cook County. Thus, in *Young*, the Chicago board of election commissioners was the board which initially canvassed the returns received from each precinct. Mulligan notes that the petitioner in *Young* filed the election contest petition seven days before the State Board issued its proclamation. In *Young*, however, both the majority and the dissenting opinions calculated the 10-day period specified in section 7—63 for filing an election contest petition as running from the date on which the State Board of Elections proclaimed the winner of the election. (*Young*, 127 Ill. App. 3d at 1095, 1098.) Thus, the *Young* opinion actually supports Pullen's

claim that the 10-day filing period specified in section 7—63 began after the State Board canvassed the returns.

Mulligan finally argues that this court should construe the phrase "canvassing board making the final canvass of returns" in section 7—63 as referring to the canvassing board which "examines and counts" the returns because such a construction would promote prompt resolution of primary election contests. It is true that adopting Mulligan's definition of "canvass" might expedite the contest procedure, by requiring the party contesting the election to file his or her petition earlier. An election contest proceeding, however, is instituted by one who claims to have been elected against one who has been declared elected, and therefore cannot proceed until it is known who has been declared elected. In the case of candidates for legislative offices, it is not until the canvass is made by the State Board of Elections that the result can be officially known. Moreover, to adopt Mulligan's definition of canvass would require us to ignore the clear language of sections 7—56(6) and 8—15 of the Election Code, which state that the State Board of Elections shall canvass the certified tabulated statements of returns which it receives from the County Canvassing Board.

We cannot ignore the fact that the County Canvassing Board did not actually "count" the votes in the election here. After the polls closed, the election judges in each precinct entered the ballots into automatic tabulating equipment, which counted the ballots and recorded the votes for each candidate. The automatic tabulating equipment then generated a precinct return, which was certified by the judges of election and sent to the county clerk as the official returns. (See Ill. Rev. Stat. 1989, ch. 46, par. 24A—10.1.) Thus, the votes were "counted" in

each precinct. The County Canvassing Board simply opened these precinct returns and tabulated the results.

We consider that Mulligan adopts too restricted a construction of the term "canvass." Webster's dictionary defines the term "canvass" to mean "to examine in detail: subject to scrutiny or investigation; *specif:* to examine (votes) officially for authenticity." (Webster's Third New International Dictionary 329 (1986).) Applying this definition of the term "canvass," it is clear that both the County Canvassing Board and the State Board of Elections canvassed the returns of the primary election at issue here. The County Canvassing Board examined the returns it received from each precinct and prepared a tabulated statement of returns stating the number of votes cast for Mulligan and Pullen individually and the total number of ballots voted for the Republican party in the primary. This tabulated statement of returns was then certified to the State Board of Elections. In the statutory electoral scheme, it is the function of the State Board then to examine or canvass this tabulated statement of returns before proclaiming the results of the election. Had the certified tabulated statement of return contained an obvious error, such as indicating more votes cast for the candidates than the total number of ballots voted, the State Board certainly would have investigated the matter before it proclaimed one candidate elected. Neither canvass is any more a canvass than the other. Under the clear language of the statute, the State Board of Elections is the canvassing board which makes the final canvass of the returns. There is nothing in the statute demanding a different construction, and this view of it renders the Election Code, as a whole, consistent and harmonious, while to hold otherwise must lead to uncertainty and confusion. Accordingly, we hold that the trial court properly denied Mulligan's motion to dismiss the election contest petition as untimely.

We next consider whether the trial court should have counted certain contested ballots in determining which candidate was elected as the Republican nominee for Representative of the 55th Representative District. Although we will consider each of the seven categories of contested ballots separately, a brief discussion of the general principles applicable to all such challenges is appropriate. The Election Code is a comprehensive scheme which regulates the manner in which elections shall be carried out. Strict compliance with all applicable provisions in the Election Code is not necessary, however, to sustain a particular ballot. Rather, our courts draw a distinction between violations of "mandatory" provisions and violations of "directory" provisions. Failure to comply with a mandatory provision renders the affected ballots void, whereas technical violations of directory provisions do not affect the validity of the affected ballots. *Hester v. Kamykowski* (1958), 13 Ill. 2d 481.

There is no universal formula for distinguishing between mandatory and directory provisions. Rather, whether a particular statutory provision is mandatory or directory depends upon the intent of the legislature, which is ascertained by examining the nature and object of the statute and the consequences which would result from any given construction. (*Carr v. Board of Education* (1958), 14 Ill. 2d 40, 44.) Of course, the language of the statute is often the most reliable evidence of the legislature's intent. Thus, where a statute, in prescribing the duties of the election officials, expressly states that failure to act in the manner set out in the statute will void the ballot, that statute will generally be given a mandatory construction. However, if the statute simply prescribes the performance of certain acts in a specific manner, and does not expressly state that compliance is essential to the validity of the ballot, then the statute generally will be given a directory construction. (*Carr v.*

*Board of Education* (1958), 14 Ill. 2d 40, 44; *Hester v. Kamykowski* (1958), 13 Ill. 2d 481, 485; *People ex rel. Cant v. Crossley* (1913), 261 Ill. 78, 102; see 2A A. Singer, Sutherland on Statutory Construction §57.08, at 658 (Sands 4th ed. 1984).) Accordingly, as the court stated in *Craig v. Peterson* (1968), 39 Ill. 2d 191, 196:

> "[I]n construing statutory provisions regulating elections the courts generally have tended to hold directory those requirements as to which the legislature has not clearly indicated a contrary intention, particularly where such requirements do not contribute substantially to the integrity of the election process."

We do not mean to suggest, of course, that election officials may simply ignore directory provisions of the Election Code. All of the provisions of the Election Code are mandatory in the sense that election officials are obligated to comply with their terms. It does not follow, however, that every failure to comply should invalidate the ballot in question. Literal compliance with directory provisions will not be required if it appears that the spirit of the law has not been violated and the result of the election has been fairly ascertained. (*Hester v. Kamykowski* (1958), 13 Ill. 2d 481, 485; *People ex rel. Woods v. Green* (1915), 265 Ill. 39.) Applying the foregoing principles, we consider the particular challenges which the parties raise here.

### 1. Uninitialled Absentee Ballots

We first consider whether the trial court erred in counting absentee ballots which did not contain the initials of an election judge. The parties stipulated at trial that 27 in-precinct ballots and 55 absentee ballots did not contain the initials of an election judge. The parties agreed at trial that the uninitialled in-precinct ballots would not be counted. They disagreed as to the admissibility of the uninitialled absentee ballots. Prior to the re-

count, the appellee argued that the uninitialled absentee ballots should be considered, and the appellant argued that they should not. The trial court ruled in the appellee's favor. After the recount, the positions of the parties changed as to this issue, and the appellee asked the trial court to reconsider its ruling that the uninitialled absentee ballots should be counted. The trial court granted the motion to reconsider, and again ruled that the uninitialled absentee ballots should be counted.

Section 7—44 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 7—44) provides that the election judge shall give a voter a primary ballot, on the back of which the primary judge shall endorse his initials. Sections 19—9 and 24A—10.1 of the Election Code extend this requirement to absentee ballots. Section 24A—10.1 specifies:

> "Immediately after the closing of the polls, the absentee ballots delivered to the precinct judges of election by the election authority shall be examined to determine that such ballots comply with Sections 19—9 and 20—9 of this Act and are entitled to be deposited in the ballot box; those entitled to be deposited in the ballot box shall be initialed by the precinct judges of election and deposited in the ballot box." (Ill. Rev. Stat. 1989, ch. 46, par. 24A—10.1.)

Section 7—51 of the Election Code specifies that "[n]o primary ballot, without the endorsement of the judge's initials thereon, shall be counted." (Ill. Rev. Stat. 1989, ch. 46, par. 7—51.) Section 24A—10.1 also provides that the judges of election shall examine all ballot cards in the ballot box to determine whether they contain the initials of an election judge. If any ballot card or ballot card envelope is not initialled, it must be marked "Defective" on the back and not counted. Ill. Rev. Stat. 1989, ch. 46, par. 24A—10.1.

Our courts have held that the statutory requirement that judges of election initial each ballot before placing it in the ballot box is mandatory, and that no ballot without such initials may be counted. (*Tuthill v. Rendelman* (1944), 387 Ill. 321, 330 (rejecting uninitialled in-precinct ballots); *Morandi v. Heiman* (1961), 23 Ill. 2d 365 (rejecting uninitialled absentee ballots).) In *Craig v. Peterson* (1968), 39 Ill. 2d 191, however, the court held the initialling requirement directory and allowed the counting of uninitialled absentee ballots. The trial court here, relying upon *Craig*, allowed the uninitialled absentee ballots to be counted.

In *Craig*, the plaintiff argued that the absentee ballots returned from 14 precincts should be invalidated because none of them contained the initials of an election judge. The defendant responded that the statutory requirement of initialling was directory, rather than mandatory, and that the ballots should be counted. The *Craig* court acknowledged that the application of the statutory initialling requirement is mandatory in the usual case, because it enables the election judges to identify those ballots which they have personally placed in the ballot box, and therefore is an effective safeguard against fraudulent practices such as "stuffing" a ballot box. The court found, however, that statutory requirements which deprive qualified voters of their right to have their vote counted, without fault on the part of the voters, are constitutionally suspect where such requirements do not contribute to the integrity of the election process. The court concluded that application of the initialling requirement to absentee ballots at issue in *Craig* was unnecessary to ensure the integrity of the election and, therefore, construed the initialling requirement as directory in that case.

In *Craig*, all voters who voted in person at the polling place used voting machines. Therefore, the election

judges did not initial in-precinct ballots. The only paper ballots used in the election were those cast by absentee voters. None of the absentee ballots were initialled. The court concluded that, under the circumstances, the initialling requirement did not contribute to the integrity of the election process. The court observed that the initialling requirement did not "assist in separating the illegally cast from the legally cast ballots for there were no other paper ballots *** and there is no claim that these absentee ballots were altered, tampered with or in any way improperly preserved—in fact it is stipulated that these are the identical ballots received by the absentee voters from the county clerk." *Craig*, 39 Ill. 2d at 199.

The court concluded that mandatory application of the initialling requirement to the absentee ballots in such circumstances would disfranchise a substantial number of qualified voters who had done everything in their power to comply with the law, without actually contributing to the integrity of the election. In fact, application of the initialling requirement might enable corrupt election judges to deliberately refrain from initialling ballots of those absentee voters who they had reason to believe voted other than the way the judges desired. Although the court noted that this possibility always exists as to absentee ballots, courts permitted this risk in other elections only because there was no other means of separating legally from illegally cast ballots. In *Craig*, on the other hand, no such justification existed. Because the initialling requirement was not necessary to ensure the integrity of the election at issue, the court in *Craig* counted the uninitialled absentee ballots.

The *Craig* court stated that its decision was not inconsistent with the result in *Morandi v. Heiman* (1961), 23 Ill. 2d 365, where uninitialled absentee ballots were not counted. The court noted that *Morandi* involved an all-paper-ballot election in which identical ballots were

used by in-precinct and absentee voters. Thus, in
*Morandi*, unlike *Craig*, there was no satisfactory method
of separating the absentee ballots from the illegally cast
in-precinct ballots. Although the respondent in *Morandi*
attempted to show that the absentee ballots could be dis-
tinguished from the in-precinct ballots, because they had
been folded differently than the in-precinct ballots, the
court in *Morandi* concluded that attempting to distin-
guish " 'a validly cast ballot from an illegal one upon
such fortuitous circumstance would be a dangerous
rule.' " *Craig*, 39 Ill. 2d at 198, quoting *Morandi v.
Heiman* (1961), 23 Ill. 2d 365, 374.

Two appellate court decisions have considered the
statutory requirement that ballots must be endorsed by
an election judge in light of *Craig*. (*Snow v. Natzke*
(1986), 140 Ill. App. 3d 367; *Goble v. Board of Education*
(1980), 83 Ill. App. 3d 284.) In *Goble*, the court applied
*Craig* to an all-paper-ballot election and held that nine
absentee ballots could be counted even though they were
not endorsed by an election judge. The court noted that
the parties had stipulated to the absence of fraud and
that the sole irregularity complained of was the failure
to initial the absentee ballots. The court concluded that
the initialling requirement must be held directory in cir-
cumstances where the exclusion of the uninitialled bal-
lots would disfranchise innocent voters without contrib-
uting to the integrity of the election process.

In *Snow v. Natzke* (1986), 140 Ill. App. 3d 367, the
court refused to count ballots which did not bear the ini-
tials of an election judge. The court concluded that the
rule in *Craig* did not apply unless the evidence positively
demonstrated that the uninitialled ballots were cast by
absentee voters rather than persons voting in person at
the polling place.

As stated, the trial court here, relying upon *Craig*,
concluded that the initialling provisions were directory

and counted the uninitialled absentee ballots. In so holding, the trial court concluded that the uninitialled ballots were absentee ballots and that those ballots were validly cast. The appellee argues that *Craig* does not apply here. She argues that *Craig* is limited to machine elections in which the only paper ballots used are absentee ballots. She argues that this election was an all-paper-ballot election because both the in-precinct and the absentee ballots were paper punch card ballots. The appellee also argues that *Craig* is not applicable here because the parties did not enter into a stipulation that the absentee ballots were authentic.

The appellant responds that *Craig* applies to any election in which the uninitialled absentee ballots can be readily identified and distinguished from uninitialled, and thus invalidly cast, in-precinct ballots. She argues that the expert trial testimony of Robert Logay, director of elections for the county clerk, established that the absentee ballots used in this election are readily identifiable because they contain handwritten precinct numbers. The in-precinct ballots, on the other hand, contain preprinted precinct numbers. The appellant also argues that the fact that the parties did not enter into a stipulation is irrelevant here, because neither party raised any allegation of fraud or questioned the authenticity of the disputed absentee ballots.

We conclude that the trial court correctly allowed the uninitialled absentee ballots to be counted. Under *Craig*, uninitialled absentee ballots may be counted only if: (1) the absentee ballots can be identified and distinguished from in-precinct ballots; and (2) the initialling requirement does not contribute to the integrity of the election process.

In *Craig*, ballots cast by absentee voters were readily identifiable, because voters at the polling place used voting machines. Here too, ballots cast by absentee voters

are readily identifiable and distinguishable from ballots cast by voters at the polling place. The testimony at trial established that all absentee ballots have handwritten precinct numbers, while in-precinct ballots have pre-printed precinct numbers. Because the uninitialled absentee ballots can be readily distinguished from uninitialled in-precinct ballots, the first prong of *Craig* is satisfied. *Cf. Morandi v. Heiman* (1961), 23 Ill. 2d 365 (uninitialled absentee ballots could not be distinguished from the uninitialled in-precinct ballots).

The question of whether application of the initialling requirement to absentee ballots is necessary to maintain the integrity of the election process is a closer question. Applying the initialling requirement to *in-precinct* ballots is certainly necessary to preserve the integrity of the election, because the initials provide the only means by which the election officials can identify and separate the legally cast from the illegally cast in-precinct ballots. Thus, here, as in *Craig*, application of the initialling requirement to in-precinct ballots prevented fraudulent practices, such as stuffing the ballot box.

Because absentee ballots are not cast in the polling place, and are not opened until after the polls have closed, application of the initialling requirement to such ballots is not necessary to prevent voters from fraudulently stuffing the ballot box. Here, as in *Craig*, neither party questioned the legitimacy of the uninitialled absentee ballots or alleged any fraud or other irregularity. Accordingly, under the reasoning adopted in *Craig*, application of the initialling requirement is not necessary to preserve the integrity of the election process.

The appellee argues, however, that this case is distinguishable from *Craig* because the parties in *Craig* stipulated that the absentee ballots were the identical ballots that the absentee voters received from the county clerk. She claims that no such stipulation exists here. Accord-

ingly, she argues that application of the initialling requirement safeguards the integrity of the election process because it guards against the possibility that some unauthorized person fraudulently replaced the genuine initialled absentee ballots with substitute uninitialled ballots sometime after the genuine ballots were deposited in the ballot box. Basically, the appellee argues that application of the initialling requirement is necessary to ward against the possibility that someone tampered with the absentee ballots after election night.

We must reject the appellee's attempt to distinguish *Craig* on this ground. The parties here entered into a stipulation that any and all ballots sought to be admitted into evidence at trial, including the uninitialled absentee ballots questioned here, had been properly preserved from election night to the time of their presentation in court, and that their preservation was in accordance with the provisions of the Election Code and other applicable statutory provisions. Because the appellee stipulated that the uninitialled absentee ballots were properly preserved, she is now precluded from arguing that application of the initialling requirement is necessary to ensure that there was no tampering with the absentee ballots before they were presented to the court. This stipulation, like the stipulation in *Craig*, removed any concern that other ballots were substituted for the authentic absentee ballots after election night.

Because the uninitialled absentee ballots are readily identifiable and distinguishable from in-precinct ballots, and because application of the initialling requirement is not necessary to safeguard the integrity of the election process, we conclude that *Craig* applies. Accordingly, the trial court properly counted the uninitialled absentee ballots.

## 2. Ballots Lacking Precinct Numbers

The appellant argues that 14 absentee ballots without precinct numbers are invalid and should not have been counted. These 14 ballots may be divided into two categories: (1) 10 ballots in which the sole irregularity complained of is the absence of a precinct number; and (2) four ballots which, in addition to not having a precinct number, also bear the title "Niles Township." Only the first category of ballots is addressed in this section. The second category of ballots is discussed in the next section, which considers the validity of ballots with the wrong precinct number.

Section 7—20 of the Election Code states that "[o]n the back or outside of the primary ballot of each precinct, so as to appear when folded, shall be printed the words 'Primary Ballot,' followed by designation of said precinct, the date of the primary and a facsimile of the signature of the election authority who furnished the ballots." Ill. Rev. Stat. 1989, ch. 46, par. 7—20.

There has not been as yet a construction of section 7—20, but a number of decisions have interpreted a similar provision in the Election Code which sets out the form, contents and manner of printing of ballots used in general elections. (Ill. Rev. Stat. 1989, ch. 46, par. 16—3.) Section 16—3 specifies that "there shall be printed on the back of each ballot card *** the words 'Official Ballot,' followed by the number of the precinct or other precinct identification, *** the date of the election and a facsimile of the signature of the election authority who has caused the ballots to be printed."

At first, our courts gave section 16—3 a mandatory construction and held that ballots which did not strictly comply with all of the printing requirements set out in that section were invalid. See, *e.g., People ex rel. Mattingly v. Snedeker* (1918), 282 Ill. 425 (election void be-

cause the ballots used did not contain the words "Official Ballot," followed by the designation of the polling place for which the ballot was prepared, the date of the election and the facsimile signature of the officer who caused the ballots to be printed); *People ex rel. Vance v. Bushu* (1919), 288 Ill. 277 (election voided because ballots did not contain the facsimile signature of the town clerk on the back thereof); *People ex rel. Childress v. Illinois Central R.R. Co.* (1921), 298 Ill. 516 (ballots which did not designate the polling place were invalid).

In *Hester v. Kamykowski* (1958), 13 Ill. 2d 481, however, the court overruled decisions which held all such requirements mandatory, and held that failure to strictly comply with statutory requirements as to the form of the ballot will not necessarily render a ballot void. The court conceded that printing errors which interfere with the voters' ability to freely exercise their choice (*e.g.,* ballots which do not provide for write-in candidates) or which destroy the secrecy of the ballot (*e.g.,* translucent envelopes) will invalidate the affected ballots. The court concluded, however, that unintentional errors in printing will not void the ballot where they do not affect the merits of the election. Applying these principles to the facts before it, the *Hester* court stated:

"In the instant case the form of ballot failed to disclose on the back or outside the words 'Official Ballot' and the date of the election, nor did it anywhere designate the polling place for the particular ballot although there were four polling places in the election. \*\*\* We are of the opinion that under the present circumstances these irregularities, standing alone, would not, of themselves, justify throwing out the entire number of ballots. [Citation.] Expressions of this court to the contrary \*\*\* insofar as they construe the requirements as mandatory regardless of the circumstances and effects in the particular case, represent an unduly strict application and can no longer be accepted as correctly stating the rule.

By enforcing with too great technical exactness the provisions concerning the form of ballots the very object of those provisions in securing a fair election may be defeated." (*Hester*, 13 Ill. 2d at 487-88.)

Under *Hester*, technical irregularities, including the absence of a precinct designation on the ballot, do not justify voiding the affected ballot.

The appellant argues that *Hester* should not be controlling because the court did not consider section 17—16 of the Election Code, which states:

"No ballot without the official endorsement shall be deposited in the ballot box, and none but ballots provided in accordance with the provisions of this Act shall be counted." (Ill. Rev. Stat. 1989, ch. 46, par. 17—16.)

The appellant argues that the second clause in section 17—16 makes the printing requirements set out in section 16—3 mandatory, in that it specifically prohibits election judges from counting ballots which do not strictly comply with the provisions of the Election Code.

Section 17—16, however, applies only to general elections and precludes the counting of ballots defective as described which may be used in such elections. Here, we are considering ballots used in a primary election. Section 7—51 of the Election Code, which regulates primary elections, simply states that no primary ballots without the endorsement of a judge's initials thereon shall be counted. That section, unlike section 17—16, does not have a general provision that only ballots provided in accordance with the provisions of the act shall be counted.

Moreover, the appellant's claim that the second clause of section 17—16 was intended to include a prohibition of the counting of ballots which do not contain a precinct number is unconvincing. The second clause of section 17—16, stating that "none but ballots provided in accordance with the provisions of this Act shall be counted," does not void every ballot with printing irreg-

ularities. Rather, that clause was designed to require the use of only official ballots provided by the election authorities and to invalidate unofficial ballots which might be supplied by candidates, political parties or indeed prepared by the voters themselves for a personal touch.

The appellant also relies upon *Pinkston v. Holland* (1971), 113 Ill. App. 2d 865, for the proposition that ballots which do not bear a precinct designation are invalid. In *Pinkston*, the court voided an election for village officers because the ballots lacked a printed facsimile of the signature of the clerk who caused the ballot to be printed, as required by section 16—3 of the Election Code. Instead, the clerk had manually signed her name on the ballots on the evening before the election. The court concluded that the printed facsimile requirement specified in section 16—3 was mandatory in nature.

The question here was not involved in *Pinkston*. Moreover, the court in *Pinkston* did not attempt to distinguish this court's *Hester* decision, which construed the printing requirements in section 16—3 as directory. Instead, the court relied upon a series of cases which were impliedly overruled in *Hester*.

Under this court's holding in *Hester* the absence of a precinct identification on certain ballots, standing alone, did not invalidate those ballots. Section 7—20 must be regarded as directory only.

### 3. Ballots with the Wrong Precinct Designation

The appellant next argues that the trial court should not have counted five ballots because they bore the wrong precinct number. Three of these ballots were absentee ballots, with the wrong precinct number manually written on the ballot, and two ballots were in-precinct ballots, which had the wrong precinct number printed thereon. The appellant also argues that four ballots without precinct numbers should not have been counted be-

cause those ballots bear the title "Niles Township." The appellant notes that no part of Niles township is within the 55th Representative District. We address each of these claims separately.

The appellant filed a motion in the trial court to have these ballots excluded from the recount, but the trial court denied the motion, relying upon the decision in *Hester v. Kamykowski* (1958), 13 Ill. 2d 481. The appellant contends that the trial court's reliance on *Hester* was misplaced. She argues that *Hester* did not consider whether ballots cast in the wrong precinct should be counted. Appellant also argues that, under *Hester*, ballots which do not have a precinct number are invalid when those ballots also have other irregularities.

The appellee argues that the record contains no evidence of illegal voting or proof that these ballots were cast in the wrong precinct. She argues that these ballots involve a ministerial error on the part of an election judge.

Section 7—43 of the Election Code, which defines the qualifications of voters at primary elections, specifies that every person who is a United States citizen of 18 or more years of age, and who has resided in the State for 6 months and in the precinct for 30 days before the primary, shall be entitled to vote at the primary. (Ill. Rev. Stat. 1989, ch. 46, par. 7—43.) Nothing in the Election Code specifically states that a ballot cast in the wrong precinct is invalid.

The appellant argues, however, that in *Boland v. City of LaSalle* (1938), 370 Ill. 387, and *Thornton v. Gardner* (1964), 30 Ill. 2d 234, our court held that ballots cast in the wrong election jurisdiction should not be counted in the election results. In *Boland*, a resident of the City of LaSalle's 7th Ward cast her ballot in the 6th Ward. The court refused to count her vote, concluding that the vote "was clearly illegal because cast in the wrong ward,

[and] it cannot now be counted either for or against the third proposition." (*Boland*, 370 Ill. at 398.) In *Thornton v. Gardner* (1964), 30 Ill. 2d 234, 235, the court stated that the votes of seven persons who voted at the wrong polling place were determined to be illegal votes. Because there was no evidence as to how these seven voted, the court held that it was appropriate to deduct the votes on a *pro rata* basis. See also *Tuthill v. Rendelman* (1944), 387 Ill. 321, 346 (where undisputed evidence established that the voter did not live in the precinct in which she sought to vote, the trial court did not err in refusing to count that vote).

The appellant argues that *Boland* and *Thornton* are controlling here, and that ballots which bear the wrong precinct designation may not be counted. Although we agree that, under *Boland* and *Thornton*, ballots cast in the wrong precinct are invalid, the facts in this case are distinguishable. The evidence in *Boland* and *Thornton* established with certainty that one or more voters voted at the wrong polling place. Here, on the other hand, there is no evidence that any voter cast a ballot in the wrong precinct. The evidence established only that certain ballots bore the wrong precinct number.

We also disagree with the appellee's contention that the court's decision in *Hester v. Kamykowski* (1958), 13 Ill. 2d 481, is controlling. In *Hester*, the court held that the absence of a precinct designation, *standing alone*, is not sufficient to invalidate a ballot. The nine ballots disputed here are not simply missing a precinct number. Rather, five of those ballots have the wrong precinct number either written or printed thereon, and four ballots, in addition to not having a precinct number, bear a township designation outside the 55th Representative District.

Thus, the two categories of ballots here fall somewhere in between the ballots held valid in *Hester* and the

ballots invalidated in *Boland* and *Thornton*. Accordingly, we must consider the policy considerations underlying each of those decisions in determining whether the trial court properly counted the ballots questioned here. In *Boland* and *Thornton*, the evidence established that voters improperly went to the wrong polling place to cast their ballots. The error was therefore attributable to the fault of the voter, and the voters, basically, disfranchised themselves. In *Hester*, on the other hand, the court repeatedly stated that ignorance, inadvertence or mistake on the part of the election officials should not be permitted to disfranchise an election district or to defeat the will of the electorate. (*Hester*, 13 Ill. 2d at 487-88.) Accordingly, the court held that irregularities in the form of the ballot, which occur because of the honest mistake of election officials, will not, by themselves, invalidate the election. Other decisions have likewise expressed a reluctance to construe statutory requirements so as to deprive fully qualified voters of their right to have their votes counted, simply because of a mistake on the part of election officials. *Craig v. Peterson* (1968), 39 Ill. 2d 191, 196; *Boland v. City of LaSalle* (1938), 370 Ill. 387, 391.

At the same time, courts have not hesitated to invalidate the ballots of voters who were not qualified to vote in the election in question (*Tuthill v. Rendelman* (1944), 387 Ill. 321, 346; *Boland v. City of LaSalle* (1938), 370 Ill. 387; *Thornton v. Gardner* (1964), 30 Ill. 2d 234), or who knowingly violated election laws (*Boland v. City of LaSalle* (1938), 370 Ill. 387 (invalidating ballot on which voter wrote obscenity)).

Applying the foregoing observations to the ballots questioned here, we conclude that the trial court properly counted the five ballots with the wrong precinct number. There is no allegation or evidence that these ballots were fraudulently cast. The appellant does not

claim that these ballots were cast by voters who resided outside the 55th Representative District or who were not qualified to vote in the election at issue. She argues that the ballots should not be counted because they were cast in one precinct but counted in the wrong precinct. We cannot agree with the appellant's claim that the five ballots which bear the wrong precinct number should not be counted.

We may reasonably assume, absent evidence to the contrary, that the five ballots questioned here were properly cast in the precinct where the voter resided, because a voter may receive a ballot only after applying for a ballot and satisfying an election judge that he or she is qualified to vote and resides in the precinct in question. The statements by appellant's counsel at trial offered a plausible explanation as to why a ballot properly cast in one precinct would be found in the ballot box of another precinct. Appellant's counsel explained that in some instances, voters from several precincts cast ballots at one polling place. After the voter receives and marks a ballot which bears the number of the precinct in which the voter resides, the voter must hand that ballot to an election judge, who deposits it into the ballot box of the appropriate precinct. The evidence suggests that ballots which bore the number of one precinct within the 55th Representative District were found in the ballot box of another precinct within the 55th Representative District, because the election judges inadvertently deposited those ballots into the wrong ballot box. Although these ballots were counted in the wrong precinct, they were cast by voters who resided in the 55th Representative District and who were entitled to vote for one of the candidates involved in this contest. Any error was attributable to the election officials and not the voters. (*Cf. Boland v. City of LaSalle* (1938), 370 Ill. 387.) We conclude that otherwise qualified voters should not be de-

prived of their right to have their votes counted simply because of error on the part of the election officials.

We reach a different conclusion, however, with respect to those ballots which not only do not have a precinct number, but which also bear the township designation "Niles Township." The appellant contends, and the appellee does not object, that no part of Niles township is within the 55th Representative District. Thus, the evidence suggests that the ballots which bear the title "Niles Township" were cast by voters who resided outside the 55th Representative District. These Niles township ballots are distinguishable from the ballots with the wrong precinct number, because the former ballots were cast by voters who did not reside within the 55th Representative District, while the latter ballots were cast by voters who resided within the district. The voters who cast the Niles township ballots had no right to cast a vote for one of the candidates in this election contest. Although this court will not deprive an "otherwise qualified voter" of the right to have his vote counted, simply because of a mistake on the part of the election officials (*Craig v. Peterson* (1968), 39 Ill. 2d 191, 196; *Boland v. City of LaSalle* (1938), 370 Ill. 387, 391), the voters here were not qualified to vote for the office in question. Consequently, their votes may not be counted. The record shows that an equal number of these Niles township ballots were cast for each candidate. Accordingly, deducting these votes from each candidate's vote tally has no effect on the election results.

### 4. Ballot Applications Lacking the Voter's Signature

In her cross-appeal, the appellee argues that 41 applications for ballots were not signed by voters who nonetheless received ballots and voted. The trial court allowed these votes to be counted, finding that the provision in the Election Code requiring voters to sign

an application for ballot was directory and that, absent proof of fraud or other illegality, ballots cast in violation of that provision should not be invalidated. The appellee argues that the trial court improperly construed the statutory provision requiring voters to sign an application for ballot as directory. She argues that signature verification is mandatory because it relates directly to the integrity of the election process. She argues that the trial court should have proportionally reduced the vote totals received for each candidate by the number of votes cast by voters who failed to sign their application forms. The appellant responds that the statutory requirement for signing ballot applications is directory. She argues that violation of a directory provision of the Election Code will invalidate the affected ballot only if fraud or other illegality is demonstrated. The appellant claims that the trial court properly counted the ballots with unsigned applications, because the appellee did not allege or offer evidence of fraud.

Section 7—44 of the Election Code specifies that any person desiring to vote at a primary shall state his name, residence and party affiliation to the primary judges, one of whom shall then announce the same. The voter shall then sign the "Certificate of Registered Voter" prescribed in article 5. If the voter is not challenged, the primary judge must give him one ballot of the political party with which the voter declares himself affiliated. If the voter is challenged and is not personally known to the election judges to be qualified to vote, he may not receive a primary ballot until he completes an affidavit stating that he is qualified to vote. Section 5—29 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 5—29), which describes the "Certificate of Registered Voter" referred to in section 7—44, specifies that, "[u]pon application to vote, *** each registered elector shall sign his name or make his mark *** on a certifi-

cate," certifying that the voter is registered in the precinct and is qualified to vote. The judges of election must then compare the signature upon the certificate with the signature on the registration record card as a means of identifying the voter. The statute further provides that, if the elector is unable to sign his name, a judge of election shall check the data on the registration card to determine whether the elector is entitled to vote. Ill. Rev. Stat. 1989, ch. 46, par. 5—29.

In determining whether a statute is mandatory or directory, our courts have generally regarded the language of the statute as the best indicator of legislative intent. Thus, where a statute imposes duties upon election officials and by express language provides that the omission to perform the same shall render the election void, courts are bound to construe those provisions as mandatory. But if, as in most cases, the statute simply provides that certain acts or things shall be done within a particular time or in a particular manner, and does not declare that their performance is essential to the validity of the election, then they will be regarded as directory. (*Carr v. Board of Education* (1958), 14 Ill. 2d 40; *Gulino v. Cerny* (1958), 13 Ill. 2d 244; *Hester v. Kamykowski* (1958), 13 Ill. 2d 481, 487; *People ex rel. Cant v. Crossley* (1913), 261 Ill. 78, 102, quoting McCrary on Elections §225.) Technical compliance with each and every provision of the Election Code is not required to sustain a ballot.

Section 5—29 does not expressly declare that the observance of its provisions shall be mandatory or that failure to sign an application for a ballot will invalidate that ballot. It merely directs that the voter shall sign the affidavit. A similar statutory provision was given a directory construction in *Carr v. Board of Education* (1958), 14 Ill. 2d 40. The petitioner in *Carr* sought a declaratory judgment that three elections to increase school tax

rates were void because voters in those elections failed to execute affidavits as required by section 1—4 of the School Code (Ill. Rev. Stat. 1957, ch. 122, par. 1—4). Section 1—4 of the School Code, like section 5—29 of the Election Code, required persons desiring to vote to sign an affidavit stating their name and address, that they resided within the particular district and that they were qualified voters. The court concluded that the statute was designed to aid election officials in determining the qualifications of voters. Because the statute did not specifically invalidate the votes of persons who failed to execute an affidavit, the court concluded that its requirements should be considered directory.

Here, as in *Carr v. Board of Education* (1958), 14 Ill. 2d 40, there is no allegation that any unqualified voters voted in the election or that failure to comply with section 5—29 hindered the rights of any person to challenge the qualifications of any voter. Ballots duly received by the judges of an election and deposited in the ballot box are presumed to be legal until the contrary is shown. Here, the disputed ballots were so received and deposited and there was no evidence to rebut the presumption that these ballots were cast by qualified voters. In such circumstances, we conclude, as the court did in *Carr*, that voters should not be disfranchised because of any failure to strictly comply with the statute requiring signed certificates. The general purpose of all election laws is to obtain fair and honest elections, and "this end is paramount in importance to the formal steps prescribed as a means to its achievement." *Carr v. Board of Education* (1958), 14 Ill. 2d 40, 44.

The signature requirement set out in section 5—29 is simply one method by which election judges can verify the identity of a voter who presents himself at the polling place. In this respect, section 5—29 is distinguishable from the statutory provision which requires absentee

voters to sign an application for an absentee ballot. Because an absentee voter never appears at the polling place in person, the signature requirement is the only means by which election judges can verify the identity of the absentee voter. See *Talbott v. Thompson* (1932), 350 Ill. 86.

Furthermore, even if we agreed with the appellee that section 5—29 should be given a mandatory construction, we would not find that the section was violated here. Section 5—29 specifically provides that, if a voter is unable to sign his name, a judge of election shall check the data on the registration card to determine whether the elector is entitled to vote. (Ill. Rev. Stat. 1989, ch. 46, par. 5—29.) Judges of election are presumed to perform the duties required of them by the statute. (*Tuthill v. Rendelman* (1944), 387 Ill. 321, 332.) Thus, in the absence of evidence to the contrary, we must presume that the election judges gave ballots to electors who did not sign a ballot application only after the election judges checked the data on the registration card and satisfied themselves that the electors were entitled to vote. Accordingly, the trial court did not err in refusing to reduce the totals received by each candidate in each precinct proportionally to the number of unsigned applications found in that precinct.

## 5. Numbered Ballots

Appellee argues that the trial court should not have counted 77 ballots which were numbered. She argues that the evidence at trial established that judges of election in two precincts marked certain ballots with a number which corresponded to the number appearing on the voter's application for a ballot. She argues that, by numbering the ballots, the election judges destroyed the secrecy of the ballot, and that these ballots should not have been counted.

Our constitution states that "[t]he General Assembly by law shall *** insure secrecy of voting and the integrity of the election process ***." (Ill. Const. 1970, art. III, §4.) Several provisions of the Election Code were obviously enacted by the legislature for the purpose of ensuring the secrecy of the ballot. (See, *e.g.*, Ill. Rev. Stat. 1989, ch. 46, par. 24A—5 (voting booths "shall be placed so that the entrance to each booth faces a wall in such a manner that no judge of election or pollwatcher is able to observe a voter casting a ballot").) Nothing in article 7 of the Election Code, which sets out the rules governing primary elections, or in article 24A of the Election Code, which defines the procedures used in jurisdictions with electronic voting equipment, specifically prohibits election judges from numbering ballots.

Appellee argues, however, that section 17—11 of the Election Code, which regulates the manner of voting in general elections, states:

"Before leaving the voting booth the voter shall fold his ballot in such manner as to conceal the marks thereon. He shall then vote forthwith in the manner herein provided, except that the number corresponding to the number of the voter on the poll books shall not be endorsed on the back of his ballot." Ill. Rev. Stat. 1989, ch. 46, par. 17—11.

The appellee argues that section 17—11 specifically prohibits election judges from numbering ballots in a primary election. We disagree for two reasons. First, section 17—11 describes in detail how the voter shall mark a ballot and therefore should be construed as prohibiting voters, rather than election judges, from marking a number on the back of the ballot. Other sections of the Election Code which define the duties of election judges in general elections do not prohibit such judges from numbering ballots. (See, *e.g.*, Ill. Rev. Stat. 1989, ch. 46, pars. 17—9, 17—10.) Second, section 17—11 does not ap-

ply to primary elections. Rather, sections 7—46 and 7—47 of the Election Code define the manner in which ballots shall be voted, folded and delivered in primary elections. While these sections are similar in many respects to section 17—11, they do not specify that no number shall be endorsed on the back of a primary ballot.

The appellee nevertheless argues that numbered ballots may not be counted because they violate the secrecy of the ballot. As support for this argument, the appellee relies upon a body of case law which holds that ballots with distinguishing marks which violate the secrecy of the ballot are invalid. See, *e.g., Griffin v. Rausa* (1954), 2 Ill. 2d 421; *Hester v. Kamykowski* (1958), 13 Ill. 2d 481.

Our courts have consistently held that any deliberate marking of a ballot by a voter, not made to indicate his choice for a candidate, and which is effective as a mark by which his ballot may be distinguished, is a distinguishing mark which invalidates the ballot. (*In re Contest of Election for Governor* (1983), 93 Ill. 2d 463, 485; *Griffin v. Rausa* (1954), 2 Ill. 2d 421, 424; *Barlick v. Kunz* (1941), 375 Ill. 319, 321; *Tuthill v. Rendelman* (1944), 387 Ill. 321, 347.) Not every marking which is sufficient to distinguish one ballot from another will invalidate a ballot. The question of whether a particular mark upon a ballot is a distinguishing mark is largely a question of fact. (*Barlick v. Kunz* (1940), 375 Ill. 318, 325.) Generally, courts have held that two elements must be satisfied before a mark will be regarded as a distinguishing mark. First, the mark must be one which has been placed on the ballot by the voter himself. Marks placed on a ballot by election officials without participation of the voter do not constitute distinguishing marks. (*In re Contest of Election for Governor* (1983), 93 Ill. 2d 463, 485; *Barlick v. Kunz* (1940), 375 Ill. 318, 325; *Boland v. City of La-*

*Salle* (1938), 370 Ill. 387, 391.) A voter will not be disfranchised simply because some unauthorized person, regardless of his innocent intention, has deliberately placed marks on a ballot. *Barlick v. Kunz* (1941), 375 Ill. 318, 325-26.

Second, the mark must be made with the deliberate intention of violating the secrecy of the ballot. (*In re Contest of Election for Governor* (1983), 93 Ill. 2d 463, 485; *Griffin v. Rausa* (1954), 2 Ill. 2d 421, 424; *Barlick v. Kunz* (1941), 375 Ill. 318, 325-26.) If it appears that marks were placed upon a ballot as the result of an honest effort by the voter to indicate his choice of a candidate, and not as an attempt to signify the identity of the voter, the ballot should not be invalidated. *Griffin v. Rausa* (1954), 2 Ill. 2d 421, 424; *Barlick v. Kunz* (1941), 375 Ill. 318, 325-26.

Applying the foregoing observations to the ballots questioned here, we conclude, as did the trial court, that the numbers on the ballots are not distinguishing marks which invalidate the ballots. Neither of the elements described above is satisfied here. The numbers on the ballots were placed on the ballots by the election judges, rather than the voters. As a general rule, ignorance, inadvertence, mistake, or even intentional wrong on the part of election officials will not be permitted to disfranchise voters. (*Sibley v. Staiger* (1932), 347 Ill. 288.) Although an exception to this rule is recognized where election officials fail to comply with a mandatory provision of the Election Code, no mandatory provision of the Election Code was violated here.

In fact, to hold these numbered ballots invalid would allow corrupt election judges to deliberately disfranchise voters by numbering the ballots of those voters who they suspected would vote differently than the judges desired. The appellee concedes that the possibility of fraud exists. She argues, however, that voters could return the num-

bered ballots to the election judges and request new, unmarked ballots. As stated, however, nothing in the Election Code specifically prohibits election judges from numbering primary ballots. We will not obligate voters, at the risk of disfranchisement, to monitor the election officials to ensure that they do nothing to jeopardize the secrecy of the ballot, particularly where nothing in the Election Code prohibits the election officials from acting in the manner questioned.

The numbers also do not qualify as distinguishing marks because they were not made with the intention of violating the secrecy of the ballots or of identifying the voters. On the contrary, the election judges testified at trial that they only numbered the ballots to make it easier to count the ballots when the polls closed. It is true that this court has always endeavored to protect the secrecy of the ballot. (See, *e.g., Hester v. Kamykowski* (1958), 13 Ill. 2d 481 (where court voided an election based, in part, upon the fact that the ballots were printed upon transparent paper, in violation of section 16—3 of the Election Code).) Here, however, there is no evidence in the record which suggests that the numbered ballots were actually traced to particular voters or that the secrecy of the ballots was violated at any time during or after the voting process. In such circumstances, we must reject the appellee's claim that the numbered ballots are invalid because they violated the secrecy of the ballots.

### 6. Allegedly Lost Ballot

The appellee asserts that the trial court erred in deducting one ballot for her which was lost before the recount. The appellee states that the parties stipulated to the chain of custody of the ballots in all precincts except Maine township precinct 23. In this precinct, 160 ballots were counted on election night, but only 159 ballots were

found at the recount. The appellee argues that, because the appellant filed the petition for election contest, she had the burden of proving that the ballots counted on election night were properly preserved until the day of the recount. The appellee argues that, because the parties' stipulations expressly excluded any foundation concerning the authenticity of the ballots in precinct 23, the appellant was required to establish that ballots in that precinct were properly preserved before the recount results could be received into evidence. The appellant responds that she was not required to establish a foundation for admission of the recount results in precinct 23, because the appellee stipulated to the vote count change in that precinct. Petitioner further argues that the appellee waived this issue by failing to object in the trial court.

The returns of the election officials are *prima facie* evidence of the result of the election. The ballots, however, are the original evidence of the votes cast. In an election contest, the court may accept the ballots cast at the election as better evidence of the result than the election returns if those ballots have been properly preserved. (*Armbrust v. Starkey* (1954), 3 Ill. 2d 131, 133; *MacWherter v. Turner* (1964), 52 Ill. App. 2d 270, 273.) The contestant, as the moving party, bears the burden of proving that the ballots have been kept intact. (*MacWherter*, 52 Ill. App. 2d at 273.) If the evidence discloses that the ballots were exposed to the reach of unauthorized persons, and the returns are not likewise discredited, the ballots will not be regarded as better evidence of the result of the election. If the evidence shows that there was no reasonable opportunity for tampering with the ballots, however, they are the best evidence of the result of the election. *MacWherter*, 52 Ill. App. 2d at 273.

The question of whether the ballots have been properly preserved is a question of fact to be determined from the evidence. The contestant may satisfy her burden of proof by introducing evidence that the election officials preserved the ballots according to the statutory requirements. Even where the statutory provisions are not complied with, however, the contestant may nevertheless prevail, since the preservation requirements are directory only. (*Armbrust v. Starkey* (1954), 3 Ill. 2d 131.) Once the trial court receives the ballots into evidence for consideration, the rules regarding ballot preservation cease, and the sole question before the court becomes whether those ballots are legal or illegal. *Wood v. Hartman* (1942), 381 Ill. 474, 480; *Lisk v. Benjamin* (1982), 105 Ill. App. 3d 51.

The parties here stipulated that all ballots sought to be admitted into evidence at trial had been preserved from election night to their presentation in court and that the foundation for admitting the ballots into evidence had been established. One of the parties wrote in longhand at the end of this stipulation, however, the caveat "except as to Maine 23." In that precinct, 160 votes were counted on election night. Pursuant to the court order, the ballots in all precincts were recounted. The ballots in Maine township precinct 23 were counted three times, twice by computer and once by hand. The first computer recount showed that a total of 159 Republican ballots were cast, while a second computer recount showed a total of 160 ballots. A final recount, conducted by hand, showed a total of 159 Republican ballots.

The appellant concedes that the appellee did not stipulate to the preservation of ballots in Maine township precinct 23. She argues however, that it was not necessary to establish a foundation for introduction of those ballots, or to demonstrate that the ballots were properly preserved, because Mulligan stipulated to a vote count

change in all precincts, including Maine township precinct 23. She argues that the trial court properly gave effect to this stipulation and accepted the vote tallies on recount as correct.

Mulligan argues that the trial court erred in accepting the recount total. She argues that the parties entered into the stipulation regarding the vote count change only to reflect what was found at the recount. She argues that the parties did not intend for this stipulation to have any legal effect. Basically, the appellee is arguing that the recount results in Maine township precinct 23 were not properly admitted into evidence, because the appellant failed to establish a proper foundation for that evidence by showing that the ballots which were recounted were properly preserved.

The record shows, however, that the evidence of the recount results in all of the precincts was received into evidence, when the parties stipulated that the recount resulted in a vote change, with Pullen gaining 1 vote and Mulligan losing 30 votes. The appellee cannot on appeal complain of evidence which she has stipulated into the record. (*People v. Hawkins* (1963), 27 Ill. 2d 339; *People v. Stribling* (1982), 104 Ill. App. 3d 969.) The appellee did not object at trial to the recount results on the ground that these results reflected a change in Maine township precinct 23, and that such a change could not be considered without evidence that the ballots were preserved. The appellee also did not object when the trial court entered an order on July 16, 1990, in which it "accepted the recapitulation of the vote tallies upon the recount, showing a net gain of one vote for Pullen and a loss of thirty votes for Mulligan, as correct." In view of the stipulations in the record, and the appellee's failure to object when the court gave those stipulations legal effect, we must reject the appellee's claim that the trial

court erred in not relying upon the election night results as to Maine township precinct 23.

### 7. Partially Punctured Ballots

The appellant argues that the trial court erred in refusing to visually inspect approximately 30 partially punctured ballots. The appellant claims that visual inspection of these ballots shows that the voters clearly indicated their intent to vote for a particular candidate. She claims that even though the voters' intent was clear, the votes were not counted because the ballots could not be read by the electronic tabulating equipment. The appellant explains that voters cast their votes by placing a punch card ballot in a special device. While the card is in the device, the voter uses an instrument called a stylus to dislodge a perforated, square chad beside a number which corresponds to a number given to a particular candidate whom the voter has chosen. Later an electronic tabulating machine counts the votes cast for each candidate by passing light through the holes the stylus has made. As light passes through the hole, the machine records each vote.

In some instances, the chad did not completely detach from the ballot, but the voter instead punctured a round hole in the chad, partially dislodged the chad or made a strong indentation in the chad. The testimony at trial suggested that such perforations and indentations may occur if a voter punches the ballot while it is outside the device, punches the ballot which is not properly attached to the four corners of the device, or, because of feebleness, does not apply the stylus to the ballot with sufficient force to dislodge the chad. If sufficient quantities of light cannot pass through these perforations or indentations, the electronic tabulating equipment treats the ballot as blank.

The appellant claims that, although the electronic tabulating equipment did not count the ballots, visual inspection of the ballots shows that the voters punctured the ballots to a sufficient degree that the ballots clearly reflect the voters' intent to vote for either the appellant or appellee. She argues that the trial court should have visually inspected the ballots to determine whether the voters' intent could be ascertained, and then should have manually counted those ballots which clearly indicated the voters' intent, even though those ballots did not register on the electronic tabulating equipment. She argues that the trial court erred as a matter of law in concluding that visual inspection of the disputed ballots was improper and that only those votes which registered upon the electronic tabulating equipment would be counted.

We first consider whether the trial court erred in refusing to visually inspect the disputed ballots. The trial court denied the appellant's motion to inspect the ballots, holding that a voter must completely dislodge the chad from the ballot before that vote may be counted. As authority for its conclusion, the trial court relied upon a series of cases holding that the only appropriate way for a voter to mark a paper ballot is to make a cross (x) in the appropriate space on the ballot.

We agree with the appellant that the court's analysis was flawed. The Election Code expressly states that voters must mark their paper ballots by making a cross (x) in the space next to the candidate of their choice. (Ill. Rev. Stat. 1989, ch. 46, par. 17—11.) Our courts have given this statutory provision a mandatory construction and have held that a vote will not be counted unless two lines intersect in a cross in the appropriate place on the ballot, even if the voter's intent is clear. *Scribner v. Sachs* (1960), 18 Ill. 2d 400 (refusing to count ballots marked with a check mark or the word "yes"); *Tuthill v.*

*Rendelman* (1944), 387 Ill. 321, 345; *Barlick v. Kunz* (1941), 375 Ill. 318, 325.

Nothing in our Election Code, however, requires voters to completely dislodge the chad from the ballot before their vote will be counted. Article 24A simply authorizes the use of voting systems "in which the voter records his votes by means of marking or punching a ballot or one or more ballot cards." (Ill. Rev. Stat. 1989, ch. 46, par. 24A—1.) The ballot cards used in the election at issue here are defined as ballots which are "voted by the process of punching." (Ill. Rev. Stat. 1989, ch. 46, par. 24A—2.) Ballot cards are inserted into a "marking device," defined as an apparatus in which "ballots *** are inserted and used in connection with a punch apparatus for the piercing of ballots by the voter, or any approved device for marking a paper ballot with ink or other substance which will enable the ballot to be tabulated by means of automatic tabulating equipment or by an electronic scanning process." (Ill. Rev. Stat. 1989, ch. 46, par. 24A—2.) Although these definitional provisions suggest that voters must punch their ballots to cast their votes, they do not require voters to completely dislodge the chad before their votes may be counted.

Although the legislature certainly has the power to provide a mandatory standard for marking punch card ballots, as it did for the marking of paper ballots, no such standard has been set out in the Election Code. We would be usurping the power of the legislature if we were to infer such a standard in the Election Code and then conclude that the legislature intended such standard to be given a mandatory construction.

The appellee argues that the questioned ballots may not be counted even if the Election Code does not specifically require voters to completely dislodge the chad from the ballot. She argues that section 24A—15.1 of the Election Code expressly states that punch card ballots

must be recounted on automatic tabulating equipment. That section provides:

> "The automatic tabulating equipment shall be tested prior to the discovery recount or election contest as provided in Section 24A—9, and then the official ballots or ballot cards shall be recounted on the automatic tabulating equipment * * *.
>
> Any person who has filed a petition for discovery recount may request that a redundant count be conducted in those precincts in which the discovery recount is being conducted." (Ill. Rev. Stat. 1989, ch. 46, par. 24A—15.1.)

A redundant count is "a verification of the original computer count by another count using compatible equipment or by hand as part of a discovery recount." Ill. Rev. Stat. 1989, ch. 46, par. 24A—2.

The appellee argues that, under section 24A—15.1, punch card ballots must be recounted on automatic tabulating equipment. She argues that ballots which cannot be counted on the automatic tabulating equipment are invalid. Respondent, in essence, urges this court to construe section 24A—15.1 as mandatory in nature. As stated, whether a statutory provision is mandatory or simply directory is a question of legislative intent.

Where a statute directs that an act shall be done in a particular manner and states that failure to perform the act in the manner stated will render the affected ballot void, this court must give the statute a mandatory construction. Where the effect of failure to comply with a particular statutory requirement is not specified, however, courts must consider the nature and object of the statutory provision and the consequences which would result from construing it one way or another. *Hester v. Kamykowski* (1958), 13 Ill. 2d 481.

Here, section 24A—15.1 simply directs that ballot cards shall be recounted on the automatic tabulating equipment. It does not state that those ballots which

cannot be read by the automatic tabulating equipment shall not be counted. Nor does the Election Code specifically prohibit the counting of punch card ballots by hand. In fact, section 24A—2 of the Code specifically authorizes a candidate to verify the results of a discovery recount by counting the ballots by hand. (See Ill. Rev. Stat. 1989, ch. 46, par. 24A—2.) Although section 24A—2 does not expressly apply to court-ordered recounts in election contests, the trial court here specifically authorized a hand count of ballots in any precinct where the automatic tabulating equipment generated a result different from the results on election night or in the discovery count. The trial record shows and the appellee concedes that ballots in some precincts were manually counted during the recount process pursuant to this order and that evidence of these hand counts was introduced at trial. In fact, the stipulation that the tabulating equipment was functioning properly was based, in part, on such hand recounts. These facts suggests that a hand count is both a permissible and a necessary part of the recount process.

The fact that section 24A—15.1 does not expressly provide for a hand count of ballots which are not read by the automatic tabulating equipment does not necessarily indicate that the legislature intended to prohibit such a result. The purpose of our election laws is to obtain a correct expression of the intent of the voters. Our courts have repeatedly held that, where the intention of the voter can be ascertained with reasonable certainty from his ballot, that intention will be given effect even though the ballot is not strictly in conformity with the law. (*Gulino v. Cerny* (1958), 13 Ill. 2d 244, 248; *Griffin v. Rausa* (1954), 2 Ill. 2d 421, 424.) Permitting a hand count of ballots which clearly reflect the voters' intent would not abrogate the general statutory scheme regarding punch card ballots or undermine the fairness or in-

tegrity of the voting process. The legislature authorized the use of electronic tabulating equipment to expedite the tabulating process and to eliminate the possibility of human error in the counting process, not to create a technical obstruction which defeats the rights of qualified voters. This court should not, under the appearance of enforcing the election laws, defeat the very object which those laws are intended to achieve. To invalidate a ballot which clearly reflects the voter's intent, simply because a machine cannot read it, would subordinate substance to form and promote the means at the expense of the end. *Hester v. Kamykowski* (1958), 13 Ill. 2d 481; *People ex rel. Agnew v. Graham* (1915), 267 Ill. 481.

The voters here did everything which the Election Code requires when they punched the appropriate chad with the stylus. These voters should not be disfranchised where their intent may be ascertained with reasonable certainty, simply because the chad they punched did not completely dislodge from the ballot. Such a failure may be attributable to the fault of the election authorities, for failing to provide properly perforated paper, or it may be the result of the voter's disability or inadvertence. Whatever the reason, where the intention of the voter can be fairly and satisfactorily ascertained, that intention should be given effect. We conclude that section 24A—15.1 is directory, and that ballots which cannot be counted on the automatic tabulating equipment may be manually counted where the voter's intent can be determined with reasonable certainty from visual inspection of the ballot.

Even if we gave a mandatory construction to section 24A—15.1, however, the ballots questioned here nevertheless may be counted. The legislature anticipated that the automatic tabulating equipment would not be able to count certain valid ballots. Accordingly, it enacted section 24A—14 of the Election Code (Ill. Rev. Stat. 1989, ch. 46, par. 24A—14), which states:

"If any ballot is damaged or defective so that it cannot properly be counted by the automatic tabulating equipment, a true duplicate copy shall be made of the damaged ballot in the presence of witnesses and substituted for the damaged ballot. Likewise, a duplicate ballot shall be made of a defective ballot which shall not include the invalid votes. All duplicate ballots shall be clearly labeled 'duplicate', shall bear a serial number which shall be registered on the damaged or defective ballot, and shall be counted in lieu of the damaged or defective ballot." (Ill. Rev. Stat. 1989, ch. 46, par. 24A—14.)

Section 24A—14 clearly permits visual inspection and duplication of defective ballots to ensure that the voters' intent may be given effect. The appellee argues that section 24A—14 does not apply here, because partially punctured ballots may not be regarded as "defective" ballots. She claims that only those ballots which are rejected by the automatic tabulating equipment qualify as "defective" ballots. She argues that the ballots here were not so rejected by the equipment; they simply were not counted by such equipment. We are not persuaded by the appellee's argument that section 24A—14 applies only to ballots which are rejected by the automatic tabulating equipment.

There is no evidence in the record which supports the appellee's claim that the automatic tabulating equipment rejects certain ballots. In any event, section 24A—14 specifically refers to ballots which "cannot properly be counted by the automatic tabulating equipment," and not to ballots which are rejected by such equipment. Although the Election Code does not define the term "defective ballots," we conclude that ballots are "defective," within the meaning of section 24A—14, when votes on those ballots are not counted by the automatic tabulating equipment, even though visual inspection of the ballots clearly reflects the voters' intent to cast a

vote for one candidate or another. As stated, voters may do everything that the Election Code requires to mark their ballots, and yet still not cast votes which can be read by the automatic tabulating equipment. The defects may be attributable to improperly perforated paper or to the voters' inability to exert sufficient pressure on the ballots to completely dislodge the chads. Whatever the cause of the defects, section 24A—14 specifically authorizes hand duplication of such ballots. Visual inspection of partially punctured ballots is necessary and appropriate in an election contest to determine whether those ballots are defective. The court may then duplicate those ballots which are defective, so that they may be counted on the automatic tabulating equipment. Ill. Rev. Stat. 1989, ch. 46, par. 24A—14.

The result we reach here is consistent with decisions of courts in other jurisdictions, which have permitted visual inspection and manual counting of punch card ballots that could not be read by electronic tabulating equipment. Although these decisions did not construe the provisions of our Election Code and thus have limited authoritative value here, they are relevant insofar as they demonstrate that courts have struggled to give effect to the intention of voters where that intention can be ascertained with reasonable certainty. *Fisher v. Stout* (Alaska 1987), 741 P.2d 217 (punch card ballots which were marked entirely with pen rather than punched could be counted, even though punch card machine was available at the time of the election, because ballots provided clear evidence of the voters' intent); *Willis v. Thomas* (Alaska 1979), 600 P.2d 1079 (where voter both circled and punched boxes next to candidates' names to indicate his intent, circling of boxes alone not a sufficient indication of voter intent); *Hickel v. Thomas* (Alaska 1978), 588 P.2d 273 (punch card ballots marked with pen or pencil instead of punched held valid); *Escalante v. City of Her-*

*mosa Beach* (1987), 195 Cal. App. 3d 1009, 241 Cal. Rptr. 199 (held valid punch card ballots marked in pen rather than a punched-out chad, a ballot punched "no" with transparent tape on reverse side holding "yes" chad in place, and ballots with non-vote-signifying chads punched in addition to vote-signifying chads); *Fair v. Hernandez* (1981), 116 Cal. App. 3d 868, 879-80, 172 Cal. Rptr. 379 (where voter fails to punch out number which corresponds to a candidate and instead punches out a number which is not assigned to any candidate, ballot cannot be counted; but where voter punches out a number which is not assigned to any candidate, and also punches a number which corresponds to a candidate, the ballot must be counted); *Wright v. Gettinger* (Ind. 1981), 428 N.E.2d 1212, 1225 (ballots with chads which were partially attached but were hanging underneath the ballot were valid, because the "hanging chads" indicated voters' intent); *McCavitt v. Registrars of Voters* (1982), 385 Mass. 833, 434 N.E.2d 620 (standard for hand count of punch card ballots is not limited to a determination of whether light flows through the chad; if intent of voters can be ascertained, it should be given effect); but *cf. Rary v. Guess* (Ga. App. 1973), 198 S.E.2d 879 (where voter fails to properly use the vote recorder by punching out the chad with the instrument provided, voter has disfranchised himself with regard to that office); *LeRay v. Mullican* (La. App. 1984), 456 So. 2d 1038 (ballot marked with pencil rather than punched was void, because penciled checkmark was a distinguishing mark).

We also note that the House of Representatives Committee on Elections counted a punch card ballot in a general election contest between Ray Christensen and Gerald Weller, even though the automatic tabulating equipment could not count the ballot, because the chad was not completely dislodged. (Transcript of Proceedings of the House Committee on Elections 28-36 (March 27,

1987).) We do not, of course, regard the Committee's decision as persuasive evidence of the legislature's intent. Statements made by individual legislators after a statute is enacted do not accurately reflect the intent of the legislature when the statute was debated and enacted. (*Morel v. Coronet Insurance Co.* (1987), 117 Ill. 2d 18, 24-25.) We simply note that the Committee's decision on one punch card ballot was consistent with the decision we reach here.

## Conclusion

In sum, we uphold the trial court's determinations that: (1) uninitialled absentee ballots may be counted; (2) ballots without precinct numbers may be counted (insofar as the trial court's determination relates to ballots for which the sole irregularity complained of is the absence of a precinct number); (3) ballots which bear the wrong precinct designation may be counted; (4) ballots which were numbered by an election judge to correspond to a voter's application number may be counted; (5) ballots cast by voters who failed to sign their application form may be counted; and (6) the results of the recount, rather than the results on election night, govern in all precincts, including Maine township precinct 23.

We conclude, however, that the trial court improperly denied the appellant's motion to have the ballots on which votes could not be counted by the automatic tabulating equipment visually inspected. We also hold that the trial court improperly counted four ballots which bore the designation "Niles Township," in addition to not bearing a precinct number, since Niles township is outside the 55th Representative District. Because an equal number of these invalid "Niles Township" ballots was counted for each candidate, the trial court's determination that each candidate received 7,387 votes must be adjusted to reflect a loss of two votes for each candi-

date. Adjustment of the vote tallies results in a total of 7,385 votes for each candidate, but does not change the trial court's finding and judgment that the election resulted in a tie.

Having decided all of the issues raised by the parties, including the contention that partially punctured ballots should have been inspected and counted where proper, we determined that each candidate had an equal number of votes. We ordered the cause remanded to the trial court. This court directed the trial court to visually inspect each of the ballots not counted by the automatic tabulating equipment and to determine whether the voter's intent to cast a vote for either the appellant or the appellee could be ascertained. The trial court was further ordered to file a report of its findings with this court so we could review the trial court's determination.

The trial court's written order was filed with this court on September 18, 1990. According to the order, the trial court visually inspected a total of 27 ballots and determined that seven ballots showed the voters' intent to vote for Pullen and one ballot showed the voter's intent to vote for Mulligan. The voter's intent could not be ascertained from visual inspection of the remaining 19 ballots. Objections to the trial court's determinations as to particular ballots were filed by the appellee and the appellant. (The appellee objects in part to the trial court's judging one of these 19 ballots an overvote. It will not be necessary to address this, as any decision as to it would be without consequence to the election result.)

This court has reviewed the disputed ballots and the trial court's finding as to each ballot in light of these objections. The objection of the appellee that to be counted the chad should be fully punched out or that at least there should be a hanging chad on the back side of the ballot would set too rigid a standard for determining

whether the voter intended to vote for the particular candidate. Many voters could be disfranchised without their fault if, for example, ballots with only perforations on the chad could not be regarded as indicating the voter's intent to vote. From our examination of the ballots, we consider that the procedures used by the trial court were not improper to ascertain whether the voter intended to vote for the appellant or the appellee or whether this could not be determined. The appellee's objection that the only workable way to ascertain the intent of the voter from a punch card ballot is to find that the chad has been removed, so that the machine can count it, is legally unconvincing. This is shown by our discussion above under "Partially Punctured Ballots." We need not consider the objections of the appellant in light of the disposition we make of this appeal.

The trial court determined that seven ballots reflect the voter's intent to vote for Pullen, one ballot reflects the voter's intent to vote for Mulligan and the remaining 19 ballots should be disregarded, because the voter's intent cannot reasonably be ascertained. Accordingly, the vote tallies for each candidate must be adjusted to reflect a gain of 7 votes for Pullen and a gain of 1 vote for Mulligan.

A summary of the legal votes is as follows. The total number of votes cast for Pullen as determined by the trial court was 7,387. Two votes must be subtracted from this total, to reflect the invalid "Niles Township" ballots counted for Pullen. Seven votes must be added to the tally, to include the seven ballots which reflect the voter's intent to vote for Pullen, but which were not counted because they did not register on the automatic tabulating equipment. Thus, a net total of 7,392 votes were cast for Pullen.

Mulligan's vote total, as determined by the trial court, was also 7,387. Two votes must be deducted from

this total to reflect the invalid "Niles Township" ballots counted for Mulligan. One vote must be added to the total to include the ballot which reflected the voter's intent to vote for Mulligan, but which was not counted because the ballot did not register on the automatic tabulating equipment. Thus, a net total of 7,386 votes were cast for Mulligan. Accordingly, the appellant, Penny Pullen, was elected by a majority of six votes, as shown below. The judgment of the circuit court of Cook County is affirmed in part and reversed in part.

|  | Pullen | Mulligan |
|---|---|---|
| Trial Court's Vote Tally: | 7,387 | 7,387 |
| "Niles Township" ballots: | –2 | –2 |
| Visually Inspected ballots: | +7 | +1 |
|  | 7,392 | 7,386 |

*Judgment affirmed in part
and reversed in part.*

JUSTICE RYAN took no part in the consideration or decision of this case.